Kennedy D. Nate (14266)
**RAY QUINNEY & NEBEKER P.C.**
36 South State Street, Suite 1400
Post Office Box 45385
Salt Lake City, UT 84145-0385
Phone:  (801) 532-1500
knate@rqn.com

*Attorney for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRIAN DURYEA, individually and on behalf of all others similarly situated,<br>        Plaintiff,<br>vs.<br>DEMARINI SPORTS, INC., an Oregon corporation,<br>        Defendant. | **COMPLAINT – CLASS ACTION**<br><br>Case No.<br>Judge:<br>Magistrate Judge: |

Pursuant to Federal Rule of Civil Procedure 23, Plaintiff Brian Duryea ("Plaintiff"), by and through their counsel of record, RAY QUINNEY & NEBEKER, hereby complains against Defendant DeMarini Sports, Inc. ("Defendant") and as set forth herein.

### INTRODUCTION

1.     Defendant sells baseball and fastpitch bats it represents as certified for play under various governing standards.

2.     Based on records obtained from Washington State University ("WSU") and Defendant's own marketing, Plaintiff believes Defendant knowingly pursued regulatory bat certification through the Cosmetic-Change pathway, reserved for appearance-only modifications, while publicly touting those bats as structurally and performance enhanced.

3.      Defendant did not disclose to consumers its selection of the Cosmetic-Change certification pathway and controls the underlying design and certification records.

4.      A reasonable consumer would consider it decisive information to know that a manufacturer denied any material changes in its regulatory submissions while advertising those same changes to consumers, and would have paid less—or not purchased at all—if that information had been disclosed.

5.      Before discovery, Plaintiff cannot determine for each model whether (i) the advertised material-change claims were false, (ii) the disavowal of such changes in Defendant's regulatory submissions was false, or (iii) both. Accordingly, Plaintiff pleads these theories in the alternative under Rule 8(d)(2)–(3).

6.      The deception is ongoing: Defendant continues to market current and future model-year bats as both certified and newly enhanced without disclosing when approval rests on a Cosmetic-Change submission.

7.      Plaintiff intends to purchase certified bats from Defendant again but cannot rely on its performance and certification representations; absent corrective disclosure, future purchases would likely result in additional financial harm.

## BACKGROUND

8.      The Batted Ball Coefficient of Restitution ("BBCOR") standard, enforced by the National Federation of State High School Associations ("NFHS") and National Collegiate Athletic Association ("NCAA"), governs legal bat performance in high school and collegiate baseball.

9.      Manufacturers may obtain BBCOR certification through two pathways:

    i.      Testing Pathway. The manufacturer submits a new bat to WSU's Sports Science

Laboratory—the NCAA-authorized BBCOR lab—for testing; if the bat demonstrates BBCOR ≤ 0.500 at all test locations, the manufacturer may seek BBCOR approval from the NCAA based on those test results.

ii.  Cosmetic-Change Pathway. "Manufacturers may request [BBCOR] certification [from the NCAA] for a cosmetic-change of a previously certified bat design" by affirming a new bat has "change[d] only in appearance."

10.  The NCAA's BBCOR protocol provides that the Cosmetic-Change pathway is available where the new bat "changes only in appearance," in contrast to the Testing pathway that requires new laboratory testing at Washington State University's Sports Science Laboratory.

11.  Under either pathway, an approved BBCOR bat must bear the same printed certification mark (depicted below) and consumers have no practical way to know whether a bat was approved through the Testing or Cosmetic-Change pathway:



### THE PARTIES

12.  Plaintiff is an individual who resides in Davis County, Utah.

13.  Defendant is an Oregon corporation with its principal place of business in Hillsboro, Oregon.

## JURISDICTION AND VENUE

14.    This Court has jurisdiction under 28 U.S.C. § 1332(d)(2). This matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, the proposed Class contains at least 100 members, and minimal diversity exists: Plaintiff is a citizen of Utah and Defendant is a citizen of Oregon.

15.    Venue is proper in this District under 28 U.S.C. § 1391(b)(1)&(2) because Defendant has sold hundreds (if not thousands) of bats in this District and has continuously conducted business here.

16.    This Court has specific personal jurisdiction over Defendant because Defendant has continuously marketed, sold, and distributed bats and other baseball equipment in this District, and a substantial part of the conduct giving rise to Plaintiffs' claims occurred here.

## FACTUAL ALLEGATIONS

17.    As used herein, "Bats" means the Defendant models identified in paragraph 37 (the BBCOR models) and paragraph 43 (the non-BBCOR models), including, without limitation, representative BBCOR models (e.g., VOC-22/23/24/25; GIC-24/25; GOC-24/25; VBC-24/25; ZOA-22) and representative Fastpitch/USSSA/USA Baseball models (e.g., Prism-22/23; CF Fastpitch models; The Goods USSSA; The Goods USA; CF USSSA 2025 variants).

18.    During the Class Period, Defendant's Bats generally retailed between $200 and $600, with multiple new model lines released each year in BBCOR, USSSA, USA Baseball, and Fastpitch.

19.    During the Class Period, Plaintiff purchased multiple Bats from authorized retailers.

4

20.     Specifically, Plaintiff purchased the following bats:

   i.    2022 DeMarini Voodoo One, "VOC-22", around October 30, 2021;

   ii.    2023 DeMarini Voodoo One, "VOC-23", around January 7, 2023;

  iii.    2023 DeMarini The Goods USA, "UG2-23", around January 7, 2023;

  iv.    2024 DeMarini Voodoo One, "VOC-24", around October 9, 2023;

   v.    2024 DeMarini The Goods, "GIC-24," around October 9, 2023;

  vi.    2024 DeMarini Zoa, "ZOA-24," around October 9, 2023;

  vii.    2024 DeMarini The Goods One, "GOC-24", around October 9, 2023;

 viii.    2023 DeMarini Prism, "Prism-23", on or around February 22, 2023;

  ix.    2023 DeMarini CF -10, "CF-Fastpitch-10", around February 22, 2023;

   x.    2025 DeMarini The Goods, "GIC-25," around July 17, 2025; and

  xi.    2025 DeMarini CF -5, "CFs", on or around June 26, 2024.

21.     In purchasing each of the above bats, Plaintiff relied on Defendant's marketing claims that the Bats were materially—and not merely cosmetically—improved over prior versions when making purchase decisions.

22.     Defendant did not disclose the certification pathway for its Bats in its labeling, website, or retailer-facing materials.

23.     Presented with marketing describing a materially improved bat and no contrary disclosure, Plaintiff reasonably believed that Defendant's internal representations to regulators about the models' improvements were consistent with its consumer marketing, and that the advertised bats had been properly tested.

24.    Having used prior versions of the bats, Plaintiff purchased the new models because Defendant claimed they were redesigned and performance-enhanced.

25.    Had Plaintiff known Defendant simultaneously told regulators the design was unchanged save cosmetics, he would not have purchased the bats.

### A.  2022 DeMarini Voodoo One

26.    Towards the end of 2021, Defendant released the 2022 DeMarini Voodoo One ("VOC-22") bat.

27.    Based on WSU records and information and belief, Defendant sought BBCOR certifications from the NCAA through the Cosmetic-Change pathway, representing to the NCAA that the VOC-22 was identical to a previously approved version except for cosmetic changes.

28.    Upon information and belief, the NCAA issued the BBCOR certification based on Defendant's cosmetic changes representation.

29.    Based on advertisements in or around the same time Defendant sought and obtained a cosmetic change certification from the NCAA, Defendant made a significant marketing effort to differentiate the VOC-22 from its predecessors beyond its cosmetics.

30.    Specifically, Defendant's website (www.DeMarini.com) claimed that the VOC-22 was an approved BBCOR bat with a "new" lightweight end-cap that "enhances…barrel performance" and would deliver "unparalleled exit velocities"—material and quantifiable measures of bat improvements and performance:

Description:

Play with fire. Introducing the 2022 Voodoo One (-3) BBCOR Baseball Bat, the bat built for an unrivaled combination of elite swing speed and power. 2021's hottest bat in BBCOR, Voodoo One returns its signature X14 Alloy Barrel, revered for soul-crushing performance and maximum pop, and its new paint job marks the homecoming for Skully – a DeMarini legend. A new lightweight Tracer End Cap enhances bat speed and barrel performance, and the one-piece alloy construction delivers unparalleled exit velocity and maximum stiffness. It's the bat of your dreams - sure to give pitchers nightmares.

*See* https://www.demarini.com/en-us/product/voodoo-one-3-bbcor-wbd2396  (last visited

October 17, 2025).

31.    Based on retail marketing, Defendant also provided promotional materials and

statements to distributors and vendors, such as Justbats.com, which reiterated the VOC-22s "new"

end-cap that materially improved performance through improvements in "swing speed" which

purportedly aided the "power" of a hitter:

## Description

**DeMarini Voodoo One BBCOR Baseball Bat: WTDXVOC22**

The Voodoo One BBCOR is ready to reclaim its crown as one of the most beloved bats this upcoming season!

**Bat Benefits**

The Voodoo ONE delivers what most amateur batters want in a baseball bat...a light swing feel with incredible power potential. Last year's Voodoo ONE BBCOR was a true darling of bat reviews on social media and there is no stopping the momentum the bat has gained from last season.

This rendition of the bat will feature the same X14 Alloy that was seen last season and we believe that this material will crush baseballs once again. For the Voodoo ONEs, DeMarini is able to create this X14 material with an extra lightweight feel for which both contact and power hitters will be reaching. The reason that all hitters will want this bat is that the alloy has shown incredible power performance when it barrels up a baseball (and who can't use a little extra power???).

For this season's model, DeMarini did switch up the construction of their end cap on the bat. They have gone with the Tracer End Cap that they say incorporates lightweight materials to improve swing speeds while also aiding the power potential of a batter!

All in all, if you're playing high school or college baseball, definitely consider this Voodoo ONE BBCOR bat!

*See* https://www.justbats.com/product/demarini-voodoo-one-bbcor-baseball-bat--

wtdxvoc22/34752/ (last visited October 6, 2025) (emphasis added).

32.    Defendant did not disclose to Plaintiff, and other similarly situated consumers, that

the VOC-22—whose "new" end-cap that "enhanced" "barrel performance" such that it now could

create "unparalleled exit velocities"—was claimed to regulators that it, with its end-cap, was in truth materially unchanged from an earlier model.

33.    Given Defendant's non-disclosure of its certification pathway and exclusive control of material-change records, Plaintiff cannot yet determine which VOC-22 representation fails and therefore pleads in the alternative that (i) Defendant's "new" end-cap and performance-enhancement claims were false; (ii) Defendant's disavowal of those same performance-enhancing features to regulators was false; or (iii) both.

34.    Had Plaintiff known, at or before the point of sale, that Defendant had told regulators the "new" end-cap involved no structural or performance changes, Plaintiff would not have paid a premium price or may not have purchased the bat at all.

**B.  2024 DeMarini The Goods**

35.    In or about August 2023, Defendant released the 2024 DeMarini The Goods (GIC-24) BBCOR bat.

36.    Based on WSU approval request records and on information and belief, Defendant obtained BBCOR approval for the GIC-24 via a Cosmetic-Change submission, attesting that the model was identical to a previously certified design except for appearance-only changes.

37.    During the same period, Defendant significantly differentiated the GIC-24 in consumer-facing marketing.

38.     For example, in or around the summer of 2023, Defendant claimed in its 2024 Spring Catalog the GIC-24 was built with material structural and performance upgrades including, but not limited to a "new end cap design":



39.     By the end of 2023 and through October of 2025, Defendant claimed that the GIC-24 contained an "updated" direct connection piece on its Amazon retail site:



*See*    https://www.amazon.com/DeMarini-2024-Goods-BBCOR-Baseball/dp/B0CCYVF6N8/

(last visited October 17, 2025).

40.    Finally, throughout 2024 and 2025 Defendant's retail outlets claimed that it had a "restructured" knob that used a "reimagined combination of alloy and composite materials" to provide greater "leverage" and "durability":



See https://www.scheels.com/p/2024-demarini-the-goods-bbcor-baseball-bat/17494-WBD2462010/ (last visited October 17, 2025) (emphasis added).

41.    Defendant never disclosed to Plaintiff or other similarly situated consumers that it had represented to regulators the GIC-24 only experienced cosmetic-changes from a previous version—representations irreconcilable with the claims above of material and performance enhancement for the GIC-24.

42.    As Defendant controls all supporting documentation, Plaintiff cannot yet determine which GIC-24 representation is false, though one must be: (i) Defendant's performance and structural improvement advertising claims for the GIC-24 are false, (ii) Defendants submission to its governing body  asserting the GIC-24 was only cosmetically changed is false, or (iii) both. Plaintiff pleads these theories in the alternative under Fed. R. Civ. P. 8(d)(2)–(3).

43.     Had Plaintiff known at or before the time of sale that Defendant represented to governing bodies the GIC-24 was unchanged materially from a previous bat they would have paid less or not purchased the bat at all.

44.     The lack of pathway disclosure by Defendant, combined with messaging of an approved bat, misled consumers, including the Plaintiff, by at least half-truths, and caused a price-premium injury.

### C.  Other Cosmetic-Change BBCOR Models

45.     During the class period, Defendant also rolled out multiple purportedly "new" BBCOR bats that—based on archived marketing and WSU approval records—Plaintiff believes follow the same deception pattern: undisclosed Cosmetic-Change pathway approvals paired with consumer-facing claims with measurable non-cosmetic improvements.

46.     Specifically, Defendant rolled out twelve (12) BBCOR bats marketed within the class period, including the VOC-22 and GIC-24, with specific marketing claims and citations of physical improvements Plaintiff believes were approved through the Cosmetic-Change pathway.

47.     These include the following bats:

i.   2022 DeMarini Voodoo One – VOC-22 ("VOC-22"), which purportedly contained a new endcap that improved "swing speed" and "exit velocities";

ii.  2024 DeMarini The Goods – GIC-24 ("GIC-24"), which purportedly contained a new endcap that helped "deliver elite power on contact" and purportedly received an "updated, extended Direct Connection" for a more powerful swing;

iii.   2024 DeMarini Voodoo One – VOC-24 ("VOC-24"), which purportedly contained a reimagined combination of alloy and composite materials to enhance durability and allow for improved leverage;

iv.   2025 DeMarini Voodoo One – VOC-25 ("VOC-25"), which purportedly contained a reimagined material that gave players increased "leverage" when hitting and a "new end-cap" that will "enhance bat speed.";

v.   DeMarini Voodoo One Editions – VOC-24WS, VOC-24P, VOC-25R, VOC-25B (collectively, the "VOC Ones"), which Defendant claimed had reimagined the knob design to improve 'leverage through the swing;

vi.   2025 DeMarini The Goods – GIC-25 ("GIC-25"), which purportedly contained a "redesigned tremor end-cap" to optimize power and a "reimagined" knob designed to boost leverage;

vii.   DeMarini The Goods Editions – GIC-WS, GIC-AS, GIC-QH, GIC-24C, GIC-25T, GIC-25Y (collectively, the "GICs"), which Defendant claimed "optimize[d] power," and "improved leverage" for a player's performance.

viii.   2025 DeMarini The Goods One – GOC-25 ("GOC-25"), which purports to use a "redesigned" end-cap that contributes to barrel integrity and "optimize[s]" power as well as new knob materials to improve performance.

ix.   2024 DeMarini Voodoo – VBC-24 ("VBC-24"), which purports to use an "all-new connection" such that hitters increase energy transfer as well as a "reimagined" knob for better durability and swing leverage.

x.   2025 DeMarini Voodoo – VBC-25 ("VBC-25"), which purportedly contain a new Type V Connection such that hitters will be capable of transferring more energy during their swing as well as upgraded technology in the knob such that hitters experience better leverage.

xi.   2023 DeMarini Voodoo One – VOC-23 ("VOC-23"), which purportedly contained a new lightweight tracer end-cap that was "refined… [such that it] …optimize[d] barrel performance;"

xii.  2022 DeMarini ZOA ("ZOA-22"), which purports to have an all new endcap that "improves performance."

48.   Each BBCOR model with purported non-cosmetic changes that relies on an undisclosed Cosmetic-Change approvals would similarly mislead a reasonable consumer.

49.   This deception—pairing marketing for non-cosmetic improvements with an undisclosed Cosmetic-Change approvals—is uniform across models and presents common, class-wide questions, regardless of whether Plaintiff personally purchased each model.

**D.  Other Cosmetic-Change NON-BBCOR Models**

50.   The same misrepresentation scheme extends beyond BBCOR using substantially similar claims and cosmetic-only approvals.

51.   Upon information and belief, in other certification regimes—including Fastpitch, USSSA, and USA Baseball—Defendant advertised non-cosmetic improvements while obtaining approval by relying on prior test data or equivalency submissions that, by definition, disclaim material or physical design changes.

52. Approval records for these regimes, and evidence of non-cosmetic changes, are not publicly accessible and are within Defendant's possession.

53. Upon information and belief, Defendant misrepresented the following non-BBCOR models and the specific non-cosmetic improvement claims that mirror the BBCOR pattern:

i.   2023 DeMarini Prism (Fastpitch) ("Prism-23"), which purportedly contained an all-new V type connection piece that allegedly maximized barrel performance;

ii.  2022 DeMarini Prism (Fastpitch) ("Prism-22"), which purportedly adjusted its gapped wall barrel which "re-targetted" such that it now delivers "ultimate" fastpitch performance;

iii. 2025 The Goods USSSA ("Goods-25"), which purportedly contained an all new V type connection piece that improved energy transfer;

iv.  2023 DeMarini CF Fastpitch Drop 9 & 10 ("Drop 9/10 CFs"), which purportedly contained a redesigned end-cap that "optimized" power;

v.   2023 DeMarini CF Fastpitch Drop 11 & 12 ("Drop 11/12 CFs"), which are purportedly equipped with a new connection piece to improve energy transfer;

vi.  2025 DeMarini CF USSSA – Drop 5, Drop 8, Drop 10 ("CFs"), which claimed to have the "largest-ever barrel profile;"

vii. 2024 DeMarini The Goods USSSA Drop 5, 8 and 10 ("USSSA-Goods"), which purports the drop 8 and 10 with an "all-new" connection piece and the drop 5 with a "redesigned" end-cap that boosts performance;

viii. 2023 DeMarini The Goods USA – Drop 10 ("UG2-23"), purportedly uses a new connection to 'improve energy transfer;

54.     As outlined above, Plaintiff purchased several of these non-BBCOR models, saw Defendant's advertising claiming that the non-BBCOR bats had received changes to their structure and/or design that improved performance, and relied on Defendant's changed bat claims in purchasing the bats.

55.     Had Plaintiff known Defendant denied the existence of these purported changes to regulators or that such claims were simply not true but were made to induce consumers to purchase the bats, they would have paid less or not purchased the bat at all.

56.     This half-truth deception is uniform across Defendant's product lines and caused the same price-premium injury to Plaintiff and to all purchasers of similar models.

### E.  Injury and Ongoing Harm

57.     As Defendant continues to withhold the certification pathway for current and future models with purported non-cosmetic changes, Plaintiff cannot reasonably determine whether any current or future offer maintains the stated improvements as advertised.

58.     Absent clear disclosure of the certification pathway and consistency with performance claims, Plaintiff faces a real and immediate risk of future overpayment and loss of truthful information as they seek to acquire bats for the 2026 season and beyond, injuries that injunctive and corrective-advertising relief would redress.

### F.  Plaintiff Discovers the Deceptive Behavior

59.     By pairing non-cosmetic bat improvement claims to consumers while representing to governing bodies that the same models involved no material or physical design changes, Defendant concealed the truth and prevented reasonable discovery.

60.     In or about January 2024, Plaintiff suspected that Defendant was obtaining approvals via the Cosmetic-Change pathway while marketing the same models as non-cosmetically enhanced.

61.     Plaintiff began reviewing Defendant's marketing and certification history for the Bats and requested WSU Testing Pathway records.

62.     In or about January 2025, WSU records reflected no history of any of the Bats undergoing new performance testing through the Testing Pathway, and, upon information and belief, therefore confirm that Defendant obtained approvals exclusively through Cosmetic-Change submissions.

63.     These results corroborate Plaintiff's allegations that Defendant paired appearance-only approvals with non-cosmetic improvements, misrepresenting the quality and nature of the bats that resulted in significant damages to Plaintiff and all members of the class.

64.     Defendant's nondisclosure of its Cosmetic-Change submissions and exclusive control over certification/testing records concealed the truth from consumers.

65.     Plaintiff reasonably could not have discovered the misconduct earlier despite diligence; in January 2024 Plaintiff first suspected the practice, and in January 2025 WSU records confirmed the absence of new BBCOR Testing-Pathway results for the models at issue.

### G.  Notices of Breach Under UCC § 2-607

66.     In or around April of 2024, shortly after discovering that Defendant's performance and "new design" claims for the Bats were inconsistent with its "cosmetic-change" submission, Plaintiff notified Defendant in writing that the Bats were non-conforming and in breach of express warranties.

67.    Between April and August Plaintiff and Defendant exchanged multiple emails and calls regarding the breach, including requests for repair, replacement, or refund and substantiation of the challenged performance claims.

68.    Defendant did not cure.

## CLASS ACTION ALLEGATIONS

69.    As authorized by Rule 23(b)(2) or (b)(3) of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of a class of all other persons or entities similarly situated throughout the United States.

### The Proposed Class

70.    Class Definition (Purchases-Based). Plaintiff brings this action on behalf of all persons in the United States who, from four (4) years before the filing of this Complaint through class certification, purchased any of the Bats.

71.    Plaintiff brings common-law claims on behalf of a nationwide class and, in the alternative, state subclasses.

72.    Plaintiff alleges that the core liability questions—whether Defendant made uniform misrepresentations/omissions about the bats and whether those misrepresentations/omissions caused economic injury—are materially uniform across states.

73.    To the extent any state's law is found to differ in a way that is material to class treatment, Plaintiff will seek certification of state-specific or logically grouped subclasses and/or issue classes under Rule 23(c)(4).

74.    Nothing in this pleading depends on the application of a single state's law to all class members; any conflicts can be addressed at class certification through subclassing and tailored jury instructions.

75.    Uniform Conduct. Certification as a single class is appropriate because Defendant engaged in uniform marketing and nondisclosure that was either identical or substantially similar across all the Bats. For example, Defendant touted non-cosmetic enhancing feature changes while at the same time representing to regulatory bodies that no such enhanced features existed and that any "improvements" to the Bats were merely cosmetic.

76.    Injury. Purchasers were uniformly injured by paying a price premium and/or receiving products that did not conform to Defendant's uniform representations.

77.    Exclusions. Excluded from the Class are Defendant and its officers/directors/employees/agents, counsel of record, the Court and its staff, and any person who timely and validly opts out.

78.    Ascertainability. Class membership is objectively determinable from SKU-level sales records maintained by Defendant and major retailers/distributors who sold the Bats.

79.    Numerosity. The proposed Class contains members so numerous that separate joinder of each member of the class is impractical. There are tens of thousands of proposed Class members based on the quantity and number of Bats sold.

### Commonality

80.    Questions of law and fact common to the Class include, without limitation:

    i.    whether Defendant made uniform non-cosmetic improvement claims about the Bats;

ii.     whether Defendant failed to disclose their admission to regulatory bodies that Bats contained no non-cosmetic changes;

iii.    whether a Cosmetic-Change approval disclaims material or physical design changes and relies on prior test data;

iv.    whether, in light of (i)–(iii), Defendant's statements and omissions were false or misleading to a reasonable consumer;

v.     whether those statements/omissions were material;

vi.    whether the conduct caused class-wide price-premium (benefit-of-the-bargain) injury and the availability of common damages methodologies (e.g., hedonic regression/conjoint); and

vii.   whether injunctive and corrective-advertising relief is warranted.

**Typicality**

81.    Plaintiff's claims are typical of the Class.

82.    Like other Class members, Plaintiff purchased one or more Bats during the Class Period after exposure to Defendant's uniform "new"/non-cosmetic improvement representations and nondisclosure of regulatory submissions representing no material or physical design changes.

83.    Plaintiff and the Class assert the same legal theories—fraud/misrepresentation (including half-truths), false advertising, and unjust enrichment—arising from the same course of conduct and alleging the same price-premium/benefit-of-the-bargain injury.

84.    Plaintiff seeks the same forms of relief as the Class, including damages, restitution, and injunctive and corrective-advertising relief.

**Adequacy**

85.    Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests are fully aligned with those of other Class members: all seek redress for the same uniform misrepresentations/omissions and the resulting price-premium/benefit-of-the-bargain injury.

86.    Plaintiff has no interests antagonistic to the Class and understands the fiduciary obligations owed to absent Class members.

87.    Plaintiff has retained counsel experienced in complex consumer and class litigation who will vigorously prosecute this action and has the resources to do so.

88.    Accordingly, Plaintiff and counsel will adequately represent the Class within the meaning of Rule 23(a)(4).

**Predominance and Superiority**

89.    Predominance. Common questions predominate. Liability turns on Defendant's uniform "new"/non-cosmetic changes claims, its non-disclosure of its representation to governing bodies, and standardized approval protocols (including Cosmetic-Change submissions)—all provable with common evidence (archived product copy, catalogs, retailer listings, and governing-body approval records).

90.    The prosecution of separate actions by individual members of the proposed Class would create a risk of inconsistent or varying adjudication with respect to individual members, which would establish incompatible standards for the parties opposing the class.

91.    Common Injury & Damages. Whether this conduct misled a reasonable consumer, was material, and caused a price-premium/benefit-of-the-bargain injury are common questions.

Classwide damages are measurable from transaction-level pricing using accepted methods such as hedonic regression (and, where appropriate, conjoint analysis).

92.    Superiority. A class action is superior to individual suits because separate actions would be impractical, risk inconsistent outcomes, and duplicate discovery on the same marketing and approval records; concentrating the claims in one forum promotes efficiency, and no unusual manageability issues are expected.

93.    Rule 23(b)(2) — Injunctive/Declaratory Relief. Defendant has acted on grounds generally applicable to the Class by pairing "new"/non-cosmetic change claims with non-disclosure of their admissions to governing bodies. Defendant can readily implement corrective disclosures (as shown by its rapid post-notice edits), making injunctive and corrective-advertising relief appropriate under Rule 23(b)(2).

**FIRST CAUSE OF ACTION**
**(Unjust enrichment)**

94.    Plaintiff alleges this claim individually and on behalf of the Class.

95.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

96.    Plaintiff and Class members conferred a monetary benefit on Defendant by purchasing the Bats, a portion of which was paid to or retained by Defendant through its sales channels and pricing decisions.

97.    Defendant knew of, appreciated, and accepted this benefit.

98.    It would be inequitable for Defendant to retain the benefit because Defendant's uniform marketing and nondisclosures created a misleading net impression—pairing "new"/non-Cosmetic-Change claims with non-disclosure of their submissions to governing bodies on the

nature and quality of the product—thereby inducing overpayment and depriving purchasers of the benefit of the bargain.

99.    As a direct and proximate result, Plaintiff and the Class suffered economic injury, including price-premium overpayment and diminished value.

100.    Plaintiff brings this unjust-enrichment claim in the alternative to legal claims, including to the extent any contract is found not to govern the subject matter, is void or unenforceable, or does not afford complete relief.

101.    Plaintiff and the Class seek restitution and disgorgement of the unjust benefits retained by Defendant, together with pre- and post-judgment interest, and such other equitable relief as the Court deems just and proper, including, if appropriate, a constructive trust over monies wrongfully retained.

## SECOND CAUSE OF ACTION
### (Negligent Misrepresentation)

102.    Plaintiff brings this claim individually and on behalf of the Class.

103.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

104.    In the course of its business, Defendant supplies detailed technical product specs and performance metric information for the guidance of purchasers in business transactions—including on product packaging, its website, and materials provided to authorized retailers—regarding the nature and performance of the Bats.

105.    Defendant represented that the Bats were "new," "redesigned," "improved," "reimagined," and otherwise technically altered in ways that guided purchasers looking for "light swings," "stiff" feels, or "leverage through the zone."

106.    At the same time, Defendant disavowed any material or physical design changes in its submissions to governing certification bodies and failed to disclose those disavowals to consumers.

107.    These misrepresentations created a misleading net impression and failed to supply complete information for the guidance of consumers.

108.    Defendant had a duty to communicate complete and accurate information to consumers regarding the nature, quality, improvements, or lack thereof of the Bats and a duty to speak the truth when disclosing the same.

109.    Defendant had superior and exclusive knowledge of its design and certification records and failed to exercise reasonable care or competence in obtaining or communicating the information described above.

110.    Plaintiff and Class members justifiably relied on Defendant's uniform technical product-performance claims and, absent any disclosure to the contrary, reasonably believed Defendant's regulatory submissions were consistent with the outcomes it touted.

111.    As a direct and proximate result, Plaintiff and the Class suffered pecuniary loss, including payment of a price premium, diminished product value, and loss of the benefit of the bargain. Had the true facts been known, Plaintiff would not have purchased the Bats or would have paid less.

112.    Plaintiff seeks actual damages and all other relief permitted by law, together with pre- and post-judgment interest.

## THIRD CAUSE OF ACTION
### (Fraudulent Misrepresentation)

113.    Plaintiff brings this claim individually and on behalf of the Class and incorporates the foregoing allegations.

114.    Particularity. As detailed herein, Defendant authored, approved, and disseminated the challenged statements on its website, catalogs, product packaging, and retailer-facing materials during the Class Period. The statements appeared at the identified URLs and were false or misleading for the reasons set forth below.

115.    False statements. Defendant represented that the Bats were "new," or "reimagined," and possessed otherwise non-cosmetic performance-enhancing physical changes from previous versions, yet failed to disclose that such improvements did not exist.

116.    These non-cosmetic claim statements were false or, at minimum, made recklessly and Defendant knew they were false or that it did not have adequate information to make such statements at the time they were made.

117.    Materiality. The existence of new, performance-affecting physical changes and the internal claim to governing bodies that these physical changes did not exist were material to reasonable consumers and to Plaintiff's decision to purchase the Bats.

118.    Price premium. Bat models bearing the challenged claims commanded higher prices than both prior-year models and alternative bats, often by hundreds of dollars; in some cases, consumers are induced to replace their current bat with a "new" bat that is, undisclosed to them, relying on the very certification of the bat they already own—reflecting a price premium attributable to Defendant's representations, which Plaintiff paid.

119. This is particularly true because older model bats without the purportedly new and improved characteristics and qualities and improved, enhanced, and/or reimagined characteristics or materials, were significantly cheaper than the "new and improved" models.

120. Defendant knew or recklessly disregarded that its statements were false or misleading.

121. Intent. Defendant made and disseminated its misstatements and/or misrepresentations with the express purpose and/or intent to mislead consumers and to have consumers rely on their misrepresentations and misstatements when purchasing the Bats.

122. Reliance. Plaintiff saw and relied on the statements identified herein before purchasing the Bats and would not have purchased—or would have paid less—but for Defendant's misrepresentations and omissions.

123. Damages. As a direct and proximate result, Plaintiff and the Class suffered economic loss, including payment of a price premium, diminished value, and loss of the benefit of the bargain.

124. Defendant's conduct was willful and malicious, intentionally fraudulent, or, at minimum, undertaken with knowing and reckless indifference to Plaintiff's rights, warranting punitive damages sufficient to punish and deter such misconduct.

### FOURTH CAUSE OF ACTION
#### (Breach of Express Warranty — U.C.C. § 2-313)

125. Plaintiff realleges and incorporates the foregoing paragraphs.

126. Defendant made affirmations of fact and promises regarding the Bats' characteristics and performance—including statements such as "new lightweight end-cap … enhances barrel performance," "revised connection tuned for power hitters," "redesigned tremor

end-cap … optimize power," and similar claims—on product packaging, its website, catalogs, and retailer-facing materials.

127.    These affirmations of fact became part of the basis of the bargain, creating express warranties that the Bats would conform to the stated performance-affecting features.

128.    The Bats did not conform to these express warranties, including where approval was obtained (or kept) via Cosmetic-Change submissions that disclaim any material or physical design change and rely on prior test data, contrary to the "new"/performance representations.

129.    Plaintiff and Class members purchased the Bats in reasonable reliance on these affirmations and would not have purchased, or would have paid less, absent the warranties.

130.    Defendant received timely notice of the breach, including through pre-suit communications and/or this complaint, and is not prejudiced by any additional notice. See U.C.C. § 2-607(3)(a).

131.    As a direct and proximate result, Plaintiff and the Class suffered economic damages, including price-premium overpayment, diminished value, and loss of the benefit of the bargain.

132.    Plaintiff and the Class seek benefit-of-the-bargain damages, incidental and consequential damages where permitted, rescission or restitution where appropriate, pre- and post-judgment interest, and any other relief the Court deems just and proper.

133.    This claim is pled in addition to and not in lieu of Plaintiff's statutory and tort claims; to the extent privity is challenged, Plaintiff alleges that Defendant's consumer-directed affirmations and uniform marketing create enforceable express warranties under Utah law.

## JURY DEMAND

Plaintiffs demand a jury trial on all issues so triable.

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays for relief and judgment against Defendant as follows:

I.   Certification of the asserted claims as a nationwide class and, to the extent required, state or grouped subclasses and/or issue classes under Rule 23, appointment of Plaintiff as class representative, and appointment of class counsel;

II.   Judgment in favor of Plaintiff and the Class on all causes of action;

III.   Compensatory damages (including price-premium/benefit-of-the-bargain damages) in an amount to be proven at trial;

IV.   Restitution, disgorgement, and other equitable relief as permitted by law (including, if appropriate, imposition of a constructive trust);

V.   Punitive damages as allowed by law;

VI.   Pre- and post-judgment interest;

VII.   Reasonable attorneys' fees, costs, and expenses as allowed by law; and

VIII.   Such other and further relief as the Court deems just and appropriate.

DATED this 17th day of October, 2025.

RAY QUINNEY & NEBEKER

*/s/ Kennedy D. Nate*
Kennedy D. Nate
*Attorney for Plaintiff*

1722668